LOGAN O. SWOPE, Respondent, v. HIRAM W. LEFFING-WELL ET AL., Appellants.

December 4, 1877.

H. purchased certain real estate of S., subject to a deed of trust given to secure certain notes made by S., which notes H. covenanted to pay; and for the purpose of paying them, and thus avoiding a sale under the deed of trust, H. endorsed and procured the discount in bank of a note made by another for the amount of these secured notes. At H.'s request the holder of these secured notes sent them, with a draft on H., to the bank, with instructions to return the notes and deed of trust if the draft was not paid. The bank paid the draft with the proceeds of the discount, and retained these secured notes as collateral security for the discount, under an agreement between it and H. In making the discount the bank relied upon the real estate security, and intended taking the secured notes as collaterals, but at the same time it had notice of the agreement between H. and S., by which the former was to pay these notes. The discounted note not being paid at maturity, the bank sold the secured collateral notes, purchased the same, and advertised the real estate for sale under the deed of trust. S. brought an action to enjoin the sale. *Held*, that the secured notes were paid in the hands of the bank, and the sale should be enjoined; that these notes were really paid on behalf of H., who stood to the bank in the position of maker of the notes; that the evidence shows that H. really intended to pay the notes; that the acts of the parties accomplished a payment independently of their intention, and thus destroyed the value of the notes as collaterals; that the notes were paid with money obtained by H. from the bank, but the notes were then dead in H.'s hands, and could not be pledged by him; and that the bank, having notice of the agreement between S. and H., will not be permitted to sell the land and make S. pay the debt which H. had agreed with him to discharge.

APPEAL from St. Louis Circuit Court.
*Affirmed.*

NOBLE & ORRICK, for appellants: The secured notes were not paid. The acts of the parties did not constitute a payment. — Byles on Bills, 175 ; *Pacific Bank* v. *Mitchell*, 9 Metc. 297 ; Chitty on Bills, 321 ; *Dodge* v. *Freedman's,. etc., Co.*, 3 Otto, 79 ; *Harbeck* v. *Vanderbilt*, 20 N. Y. 395 ; *Thompson* v. *Kellogg*, 23 Mo. 284 ; *Howard* v. *Jones*, 33 Mo. 583 ; *Appleton* v. *Kennen*, 19 Mo. 637. The bank had authority to assert the notes and deed of trust as a lien against the real estate, and the injunction should not have been granted. — Abb. Dig. 245 ; 6 Hill, 37 ; *Sackett's Harbor Bank* v. *Lewis County Bank*, 11 Barb. 213 ; *Steam,. etc., Co.* v. *Weed*, 17 Barb. 378 ; 2 Cent. L. J. 692 ; *First National Bank* v. *Haire*, 36 Iowa, 443 ; *Shinkle* v. *First National Bank*, 22 Ohio St. 524.

E. B. SHERZER and ALEX. MARTIN, for respondent : The payment of the draft by the bank was a payment of the secured notes, so far as plaintiff was concerned, and neither Honoré nor his assignee could sue on them. — *Schnaake* v. *Kellogg*, 56 Mo. 136 ; *Bond* v. *Fitzpatrick*, 4 Gray, 89. The transferee of negotiable paper, after maturity, takes only the actual right and title of the transferor. — 1 Dan. Neg. Inst. 539 ; Story on Prom. Notes, 205, 206 ; *Campbell* v. *Burch*, 1 Lans. 178 ; *McCabe* v. *Swapp*, 14 Allen, 188 ; *Strong* v. *Converse*, 8 Allen, 554 ; *Brown* v. *Lapham*, 3 Cush. 554. The discount was a loan. — *Farmers', etc., Bank* v. *Baldwin*, 4 Cent. L. J. 119 ; *Niagara, etc., Bank* v. *Baker*, 15 Ohio St. 69 ; *Flekener* v. *Bank*, 8 Wheat. 338. The bank's security for the discount, so far as the secured notes were concerned, was void, and the bank could not sell the real estate by which they were secured. — *Matthews* v. *Skinker*, 62 Mo. 329.

HAYDEN, J., delivered the opinion of the court.

This is a bill to enjoin a sale of real estate in St. Louis, advertised to be sold by certain of the appellants, under a deed of trust. On December 26, 1871, the respondent,

Swope, bought of one Gordon the real estate in question, and, to secure part of the purchase-money, made his three negotiable promissory notes, known in this controversy as the Swope notes, in favor of Gordon. These notes were dated December 26, 1871; are payable, respectively, in one, two, and three years after date, and are, in the aggregate, for the sum of $35,839.95. They were secured by deed of trust on the real estate, which deed was recorded January 22, 1872. On May 25, 1872, the respondent sold the real estate to Henry H. Honoré, of Chicago, for $80,000, by deed of that date, recorded June 24, 1872; and by this deed the grantee, Honoré, as part of the consideration, assumed the payment of the Swope notes, and, by a separate contract with respondent, agreed to pay them as they became due. On May 25, 1872, to secure three notes of that date, representing $18,500 of the purchase-money, Honoré executed a deed of trust on the property; and afterwards, and before July, 1872, two more deeds of trust were given by Honoré upon the same property, the three given by him amounting to over $40,000. By transfer from Gordon, the Swope notes, secured by the deed of trust which was the first lien upon the real estate, became the property of a company finally known as the St. Louis Life Insurance Company. The first two of the Swope notes not being paid at maturity, the insurance company, early in 1874, advertised the real estate for sale, and Honoré, who had informed the insurance company that he had assumed payment of the notes, procured from it the withdrawal of the advertisement by paying certain interest and costs, and giving a draft, which, however, was not honored.

In the summer of 1874 Honoré had an interview with Mr. Doane, of Chicago, who, besides his regular business, acted as agent for the Atlas National Bank of Boston, one of the appellants in this case, and who, for that bank, was accustomed to buy negotiable paper. As to precisely what happened at this interview there is some controversy, but

it sufficiently appears that Honoré, who was well known to Doane, not as a man of pecuniary means, but as a perfectly reliable gentleman, stated to Doane that he (Honoré) had bought this real estate in St. Louis, subject to an encumbrance of about $30,000, and had agreed to have these Swope notes provided for ; that the time was up, and the insurance company, the holder, would wait no longer ; that two of the notes were then overdue and unpaid, and that he (Honoré) wanted to get the money paid over to the Bank of Commerce, in New York, as he had agreed it should be, about that time.   Doane was assured that these notes were well secured, being a first lien on real estate worth over $100,000, and a letter and abstract of title from an eminent lawyer of St. Louis, with a certificate as to the value of the property, were shown to him.   Honoré knew that Doane was agent for the Atlas Bank, and wished to borrow the money on the Swope notes and put up his own note, as Doane states it.   Doane declined to accede to this, but told Honoré that if he would get a Mr. Bowen, who, as Doane knew, had previously accommodated Honoré, to make his (Bowen's) note for an amount corresponding to the sum of the Swope notes, and payable in four months, that he (Doane), would take such note in behalf of his bank, with the Swope notes as collateral.   This was accepted, and Honoré procured Bowen's signature to a note for $32,805.97, dated about July 20, 1874, and maturing about October 3, 1874.   This contained a power to sell collaterals, and the blank for the description of the collaterals was left, as the Swope notes were then in New York, or supposed to be there.   It is a disputed point whether this note, thus signed by Bowen, and known as the first Bowen note, or Bowen-Honoré note, was endorsed by Honoré or by Bowen. This Bowen note Doane took with him to New York, telegraphing in the meantime to the Atlas Bank to honor his check in New York to the amount of " $32,805, for papers bought on your account."   On July 20th, the day after the

date of this telegram, the Atlas Bank telegraphed its correspondent in New York to pay the check of Doane. The Swope notes, however, were not in New York. Doane held no communication with the holder of the Swope notes. Honoré, however, on July 1st, had written from Chicago to the insurance company, requesting it to have the Swope notes sent to New York, and to let him know at what place in New York they were payable. Upon receipt of this letter, and about July 2d, the insurance company drew its draft on Honoré for the sum total of the Swope notes, attaching to the draft the notes and deed of trust, and handed them to its banker, the Bank of the State of Missouri, for transmission. The latter, on July 3d, sent the papers to the Bank of Commerce, at New York, saying it enclosed the draft on Honoré " for collection and credit," fixed with the Swope notes and deed of trust, the latter to be delivered on payment of draft. These enclosures were received by the Bank of Commerce, and the Honoré draft, not being paid, was protested and then returned to the Bank of Missouri.

When Doane reached New York, finding that the Swope notes had been sent back to St. Louis, he telegraphed Honoré to that effect, upon which Honoré wrote to the insurance company a letter, of date Chicago, July 21st, in which he states he had made arrangements with a person who had gone to New York " to pay the Swope notes ;" that this person was about to leave New York for Boston, and " says he will pay the notes if they are sent to the Atlas Bank, at that place." Upon receipt of this letter the insurance company wrote to the Bank of Missouri, enclosing the Honoré draft which had been sent back from New York, and also a new draft for $80.31, representing interest and protest fees, and directed its banker to send these drafts to the Atlas Bank, at Boston, for collection. This letter, of date July 22d, contains the direction : " Upon payment of these two drafts you will have the three notes, Logan O.

Swope, and the deed of trust herewith attached, delivered to the party paying. In case the paper is not promptly paid, you will please have it retained in Boston a week or ten days." The Bank of Missouri accordingly sent to the Atlas Bank the two drafts, the Swope notes, and deed of trust, saying that the Honoré drafts were sent for collection, with the Swope notes, and deed of trust securing the same, and directing the surrender of the notes and deed of trust upon payment of the drafts. On July 25th, and before Doane reached Boston, the Atlas Bank acknowledged receipt of these enclosures, and in the same letter said: "Honoré not paid. We hold subject to your order." Doane soon after arrived at Boston, and the result of an interview between him and the president of the Atlas Bank was that the latter handed his cashier the Bowen note, saying that Doane had given it to him for discount, and that the deed of trust and the Swope notes were "to go with the [Bowen] note as collaterals," and that the blank in the Bowen note was to be filled with the description of the collaterals. This is testified to by the cashier, who says he accordingly wrote the description in the Bowen note, "and discounted the note in our ordinary course of business." Under directions of his president, he further sent the amount of the larger draft on Honoré to the Bank of Commerce, in New York, to the credit of the Bank of Missouri. The smaller draft, for $81.30, he returned to the Bank of Missouri, assigning the reason that his bank had no directions to pay it.

Shortly before the maturity of the first Bowen note, Honoré requested an extension of Doane, and accordingly a renewal note, signed by Bowen and endorsed by Honoré, was sent to the Atlas Bank by Doane, in a letter of date October 3, 1874. This second or renewal note fell due in January, 1875, and it was then renewed by a third note, made by Bowen and endorsed by Honoré. This last note being unpaid at maturity, the Swope notes were sold, under

the power to sell collaterals, and bidden in by the Atlas Bank, which proceeded to advertise the real estate for sale. It was to enjoin this sale that the present action was brought. Prior to the bringing of this suit, the respondent, by virtue of a sale under the deed of trust of date May 25., 1872, became the owner of the real estate, subject, as the appellants claim, to the deed of trust given to secure the Swope notes. The court below found that the Swope notes had been paid by Honoré; and, further, that the appellant the Atlas National Bank was a corporation organized under the National Banking Acts, and acquired its title to the Swope notes and the deed of trust in violation of the acts of Congress. A decree was entered accordingly, and an appeal taken.

In considering the question whether the notes made by the respondent and assumed by Honoré were paid, the distinction must be kept in mind between substantial acts of the persons concerned and the forms through which bankers and their book-keepers go with a view of keeping their accounts. Thus, it is of the utmost importance to settle, in this case, the relation which Doane bore to the Atlas Bank. But this relation cannot be affected by the fact that that bank kept accounts with Doane, and formally credited him with amounts on its books, any more than the relations between the bank and Honoré can be affected by the fact that the bank did not enter upon its books the draft drawn by the insurance company upon Honoré. Doane was, as he says, the agent of the Atlas Bank, and so he told Honoré at the time their arrangement was made. He acted as such throughout, and had not, he says, a particle of interest in the transaction. The bank, it appears, placed implicit confidence in him, and has never questioned his authority. Under the facts of this case, what he did the bank did, and his knowledge was the knowledge of the Atlas Bank. For the bank Doane made the arrangement with Honoré, and it is clear that all the material features of Honoré's position

were explained to Doane. But, even independently of the legal presumptions, the knowledge was brought home to the Atlas Bank that Honoré was the real debtor upon the Swope notes, and the principal party in the arrangement which Doane, as the bank's agent, had made for it. Honoré not only explained to Doane that he (Honoré) was obliged to meet the Swope notes, but, as Doane testifies, explained that the holder would wait no longer. The material point here is, not that the arrangement was, on the one hand, to "carry," or, on the other, to "pay," the notes, about which there is much indecisive testimony, but that Doane understood that Honoré, with whom Doane made the transaction, was the debtor, virtually the obligor, upon the Swope notes. This position Doane, when in Boston, had a full opportunity of explaining to his bank; and, independently of this, the knowledge of the position was brought home to the bank when, with the deeds of trust containing the assumption of payment by Honoré, the Swope notes, and the Honoré drafts before him, the cashier sat down to fill up the blank in the Bowen-Honoré note with the description of the collaterals. Again, the Honoré drafts directly drew attention to the position Honoré occupied. The principal draft was, as Doane says, the subject of conversation between him and the bank officers. Thus, the Atlas Bank had not only constructive, but actual, knowledge that Honoré was the principal in the transaction, and the debtor liable to pay the Swope notes. The facts show that Honoré was treated as the principal. When Doane found, at the Bank of Commerce, that the Swope notes and deed of trust had been returned to St. Louis, he telegraphed to Honoré that, if he (Honoré) still wished to make the arrangement, the notes must be sent to the Atlas Bank, and that he (Doane) would carry out the negotiation there. This was after the Bowen note had been given. It was Honoré who was to make the arrangement, and it was to be perfected between him and the Atlas Bank in Boston. Honoré replied, saying

the notes had been sent to the bank, and there, after this new communication and assent, the agreement was carried into execution, and the money advanced by the Atlas Bank, as Doane says, "under my arrangement with Honoré." So, too, Lane, the cashier, says that he cannot state all the circumstances of the discount, because the agreement for discount was "made by Mr. Doane, our agent." So, too, in his letter of December 19th, Doane says: "I hold the notes you speak of, as collateral security on a loan due January 14, 1875." This refers to the second note, which is produced, and shown to have been endorsed by Honoré.

It would require too much space to analyze the evidence bearing upon the question whether the first Bowen note was endorsed by Honoré. Judging both from antecedent probabilities and the direct testimony, the conclusion is, clearly, that it was; but, in view of the facts above commented upon, and of the draft drawn by the holder of the Swope notes upon Honoré as the debtor upon the Swope notes, the question as to whether Honoré was endorser on the first note is not a vital question. Why Honoré should have been upon the second Bowen note, unless upon the basis that he was at first, and continued to be, looked upon as the principal debtor, it is not easy to explain. It was Honoré who applied for the second extension, and with him that Doane made the arrangement for renewal; and the "loan" which was "due January 14, 1875," was the loan made "under my [Doane's] arrangement with Honoré," as renewed at Honoré's instance. Doane knew that Bowen had no interest in the real estate, having been so told by Honoré. When, at the maturity of the second Bowen note, Doane, in the absence of Honoré, notified Bowen, Bowen at once referred Doane to Honoré. Whether Bowen be called accommodation maker, whether he had a motive in connection with one of the mortgages in allowing his name to go on the notes, are not essential questions. The point is that Doane knew that Honoré, not Bowen, was the prin-

cipal, and the person to whom, under the arrangement, the Atlas Bank was to advance the money. Without going further into details, it is sufficient to say that Doane's testimony now, and acts at the time, show that he fully understood the relation Bowen bore to the transaction.

When the arrangement was made, Bowen became liable, of course, to the bank on the Bowen-Honoré note ; but this cannot obscure the nature of the real transaction, especially in view of the testimony of Doane and Bowen. When asked why he did not directly advance the money upon the Swope notes, Doane says because the instructions of his bank were to buy no paper running more than four months. The Swope notes were not bankable paper. Two notes were overdue ; the third had too long to run. It was, however, to the real estate that he looked ; and his testimony and conduct show, as does the figure which the Todd certificate cuts in the case, that he relied upon the property more than upon the Bowen-Honoré note, and would not have made the loan unless he had thought he was getting the security of the real estate.

This brings up the matter of intention, and the position, upon which the appellants insist, that the intention and purpose of Doane and the Atlas Bank was not to pay the notes, but to buy them ; that the design was to keep alive the security of the real estate, and, therefore, the appellants should not be precluded from availing themselves of that security. But if it is admitted, as it must be, that a person intending not to pay a note, but to buy and hold it, may pay it by his acts, in spite of his intention, then the intention cannot be the decisive test. A note, when paid by or on behalf of its maker, is discharged, whatever the intention may be. The payment by a stranger is a different matter. But Honoré was here no stranger to the Swope notes, but liable to pay them, as if he had been the maker, and this both the holder and the bank knew. As the bank had knowledge of all the material facts which in law constituted pay-

ment, it is not an excuse that they failed to observe or understand the legal operation of the facts.   Here the acts of the holder and the acts of the person whom the holder knew to be the debtor were alike directed towards the result of accomplishing a payment.   Under these circumstances, it is obvious that the case differs widely from those cited by the appellants.

*Deacon* v. *Stedhart*, 2 Man. & G. 317, was an action by an endorser against an acceptor, and it was held that the acceptor was not discharged, there being no payment by or for him.   A person had discounted the bill against the instructions of the holder, and wished to get it back again, and it was held that his act in paying the amount, in order to get possession of the bill, left the acceptor bound as before by his acceptance.   In *Pacific Bank* v. *Mitchell*, 9 Metc. 297, the plaintiff bank received the bill for collection from its correspondent, the N. E. Bank, which had discounted the bill.   It was held that the passing of the amount of the bill to the credit of the N. E. Bank by the plaintiff, when the bill came to maturity, was not such a payment as to discharge the acceptor.   In *Harbeck* v. *Vanderbilt*, 20 N. Y. 395, the rule declared is that, where the amount due upon a judgment is paid by one who is not a party to or bound by it, the judgment is extinguished, or not, according to the intention of the person paying.   In what has been said above, the points of distinction between *Dodge* v. *Freedman's, etc., Company*, 93 U. S. 379, and the case at bar have been made obvious.   It is sufficient to observe that the analogy entirely fails between the situation of the purchaser in that case and the Atlas Bank here, the Supreme Court remarking: " There is no evidence that it [the bank] had knowledge of any obligation of Huntington to take up the notes, if any such existed, and there is no evidence that Huntington did any thing about procuring an arrangement for their being taken up."   So far as concerns the question now under discussion, the case at bar is

as if Honoré, and not Swope, had been the maker upon the Swope notes. Whether, in an action against the acceptor, payment by the drawer can be pleaded as a discharge of the bill, or whether the holder may, in spite of such payment, recover the amount from the acceptor as on an unextinguished bill, has been heretofore a vexed question (*Bacon* v. *Searles*, 1 H. Black. 88 ; *Hemming* v. *Brook*, 1 Car. & M. 57 ; Byles on Bills, sec. 174 ; Pars. on Notes & Bills, 218, and note K; 2 Dan. Neg. Inst., sec. 1237) ; but payment by the drawer of an accommodation bill is a complete extinguishment of the bill. Though the drawer is not, on the face of the bill, the debtor, yet when it is ascertained that he is the party ultimately liable, payment by him discharges the bill. This was decided in *Lazarus* v. *Cowrie*, 2 Gal. & Dav. 487. The ultimate question there was whether the bill needed a stamp ; but that depended directly upon the question whether the bill was paid. If paid, it was no longer a negotiable instrument, and could not be put into circulation without a fresh stamp. Lord Denman said : " Now, it cannot be denied that if a bill be paid, when due, by the person ultimately liable upon it, it has done its work and is no longer a negotiable instrument. No person could sue upon it. No person remains liable upon it." * * * " But the drawer of an accommodation bill is in the same situation as the acceptor of a bill for value ; he is the person ultimately liable, and his payment discharges the bill altogether."

So here, when the Atlas Bank knew that Honoré was the person ultimately liable, it knew that the payment of the Honoré draft was a discharge of the notes. The cashier discounted the Bowen note, and the president directed the cashier to send to New York, to the credit of the Missouri Bank, the amount of the draft upon Honoré, which the cashier did. This would, in itself, have constituted a payment, if we are to apply to the facts the principles of the adjudged cases, but still more clearly did it become a pay-

ment, from the circumstances under which the holder received the money and the manner in which he applied it. *Field* v. *Carr*, 5 Bing. 13; *Burr* v. *Smith*, 21 Barb. 262; *Wolff* v. *Walter*, 56 Mo. 292; Byles on Bills, *172.

It was important to the Atlas Bank to enquire what title it was getting to the Swope notes, and from whom it was getting title. It is important for any purchaser, much more for him who buys negotiable paper, to make this enquiry. The title was in the insurance company, and this Doane knew; this the Atlas Bank was bound to know. Yet neither Doane nor the bank had, upon the bank's account, any communication with the insurance company, but left the whole matter to Honoré. It left Honoré to make the arrangement with the holder; and Honoré,—if any effect is to be given to language used, not long after the event, but contemporaneously, and to acts, not merely of his own, but of the holders, — made disposition for the payment of the notes. Particular phrases ought not to be strongly insisted upon, but language which concurs with acts must have its due weight. The conduct of Honoré seems to have impressed the insurance company with the understanding and belief that the Swope notes were to be paid, not bought and held. It is true, there was no restrictive endorsement upon the Swope notes but the words, "without recourse in law or equity." But the testimony of Britton, when analyzed, is not convincing upon the point of an agreement to purchase, and does not harmonize with the acts of the parties at the time. It is hardly conceivable that, if there was an understanding that the notes should be sold and held, not paid, Honoré could have used the emphatic and repeated expressions which he used indicative of his purpose to pay them. Britton is asked why he sent the notes to the Atlas Bank. He says, "I was instructed to do so by Mr. Honoré, by letter of date July 29, 1874." This letter expresses the surprise of Honoré at receiving a telegram from Britton saying that the Swope notes had

not been "paid." The truth undoubtedly is that neither Honoré nor Doane put fully before their own minds the effect that would follow a payment of the notes, or brought into juxtaposition the ideas of payment of the notes and the destruction of the security.

What is more important, however, than Honoré's expressions is the action of the insurance company, the holder, from whom, if from any one, the Atlas Bank must derive title. From Honoré it is obvious the Atlas Bank can get no title that will avail it in the present case. If Honoré had raised the money from persons in St. Louis, for instance, and " taken up " the Swope notes, it is clear that he could not have enforced the lien as against the respondent. *Kellogg* v. *Schnaake*, 56 Mo. 136. But if the notes would have been dead in his hands, in such case it is not necessary to cite authorities to show that they can have no life in the hands of a person deriving title from him, as against a party with whom he had agreed to pay them. The question recurs, then, whether the Atlas Bank can derive title from the insurance company. The letter of Honoré of July 21st is followed by the letter of the company of July 22d, which enclosed for collection the draft drawn by the company on Honoré, its debtor on the Swope notes, covering the amount of those notes and the small draft for interest and protest fees ; and the Atlas Bank is required by the holder, upon payment of the drafts, to surrender notes and deed of trust. Evidently, surrender to Honoré is intended, who had just written and telegraphed to the holder to send them to the Atlas Bank, where he had made arrangements to have them paid. The Atlas Bank recognized the fact that the draft was to be paid, by writing back, "Honoré not paid." This seems to be the acceptance of the instructions, especially in connection with the subsequent letter of the Atlas Bank to the Bank of Missouri, in which the former states that the small draft is returned to the latter, "as we have no orders to pay same." Here

are distinct acts of both parties, — the holder on one hand, the obligor of the paper on the other, — showing a common understanding that the notes were to be paid. Against these acts how is it possible to array the intention of the appellants, when such intention is but an inference arising from a conviction of what they should have done as compared with what they did?

It may be said that it was implied in the arrangement between Doane and Honoré that the latter should get the insurance company's title transferred to the Atlas Bank; that Doane negotiated on the basis that this was to be done. But whether or not Doane relied on Honoré to do it, the fact is it was not done. . Doane did nothing, and Honoré's acts were all in the direction of payment. As Lane, the cashier, says, the Bowen note was discounted. The money was thus advanced, or lent, to Honoré, and with it, under the understanding between Honoré and the insurance company, the draft covering the Swope notes was paid. When the Swope notes were sold, and purchased by the Atlas Bank, they were sold by virtue of the power of sale contained in the third Bowen-Honoré note, and hence it would seem that the Atlas Bank did not claim to derive title except through Bowen or Honoré. But Bowen never had any interest in the Swope notes, and Honoré, as we have seen, could convey none to the Atlas Bank as against this respondent.

The third and last of the Swope notes had not reached maturity when the money was advanced by the Atlas Bank, and hence it is claimed that this stands on a different footing from the other notes. But the deed of trust which was in possession of the Atlas Bank, if not before its cashier, when he filled in the description of the securities, shows that, so far as the real estate was concerned, the failure to pay one of the notes at maturity caused all to become due. The obligation of Honoré was contained in that deed, and he was obliged to pay according to its terms. If the loan

was made, as is claimed, with especial reliance upon the real property, this fact should have called attention to the conditions upon which that security depended. As it was, the obligation was upon Honoré to pay, and he did pay, the three notes.

The next question presented is as to the power of the Atlas Bank, being a bank incorporated under the National Banking Acts, to acquire the notes which were secured by deed of trust upon the real estate. The court below saw fit to go into that question, and its action in sustaining its decision upon different and independent grounds, either of which would be sufficient, cannot be assigned as error. The form of the decree may be open to criticism, but it is substantially correct, and the appellants cannot justly complain because two findings are embodied in it, either of which would justify the ultimate conclusion of the trial court.

The question as to the power of the Atlas Bank to purchase the real estate securities, or acquire them, at the time it made the discount, we do not consider an open question in this court. The same question was directly passed upon by the Supreme Court of this State in *Matthews* v. *Skinker,* 62 Mo. 329. The appellants attempt to make a distinction between that case and this by saying that the plaintiff there received no consideration for the note, secured by real estate, which she gave. But the case does not show there was no consideration; and, if it did, the decision of the court is not placed on any such ground. It is further said that the respondent here is in the enjoyment of the land for the purchase of which these notes were given, and cannot now, in equity, be allowed to say that the act of the Atlas Bank releases him from his obligation. The general principle is that where legal questions are presented for the decision of a court of equity, equity follows the law. In certain cases, however, equity refuses to give its aid to a suitor, whether plaintiff or defendant, as a court of common law would, if it had jurisdiction, without imposing

upon the suitor conditions which he ought to comply with, even though the subject of the condition should be one which a chancellor would not otherwise enforce. *Sturgis* v. *Champneys*, 5 Myl. & Cr. 102. This rests, however, upon the existence of an equitable right in the opposite party, as where a defendant, impleaded by a plaintiff seeking aid against an over-assessment, is entitled to what is justly due. The maxim is of the same nature as that which requires a suitor in equity to come into court with clean hands, and exacts that there shall be no implication of wrong-doing.

Applying this principle, we find that in the case at bar Honoré has no equity as against the respondent, and that the Atlas Bank stands in the place of Honoré. Again, there is here nothing which the respondent can fairly be called upon to do as a condition of receiving relief. On the basis of a decree in his favor, there is no virtual misconduct on his part, requiring him to submit to terms. The question is simply whether the bank shall be permitted to sell the lands, and so make the respondent pay the debt which Honoré agreed to discharge. In such case it is clear that equity must follow the law, and declare the legal rights of the parties as it finds them.

The decree of the court below is affirmed. All the judges concur.